The next case for argument is 151716, Bearer Intellectual Property v. Warner Chilcott Company. Make sure everyone's settled here. I apologize. All right, I think we're ready, Mr. Ford. Thank you, Your Honor. First, I forgot to check in. I want to apologize for any inconvenience to the court. My name is Matt Ford. I'm an attorney for the Bearer Appellants. This appeal turns on the differences between the hierarchy of evidence and the burden of proof of indefiniteness and claim construction. Warner Chilcott moved below for summary judgment of indefiniteness based only on the district court's claim construction of the terms of the whereby clause in the 940 patent. In opposition to Warner Chilcott's motion, Bearer submitted expert and other extrinsic evidence that the terms in the whereby clause had a reasonably certain meaning to those of skill and chart. But the district court found that its prior claim construction order satisfied Warner Chilcott's burden despite Bearer's evidence of meaning. Maybe I'm confusing this with another case. My understanding was you're correct that that's what the district court decided, but then he had an alternative holding, which said even if I consider all the evidence, I looked at all the evidence, and here's what I conclude, that the evidence was insufficient even if he considered it. Am I wrong about that? No, you're not, Your Honor. The primary holding is based on the intrinsic record, excuse me, is based on the claim construction order. The court then held for three reasons that even if it had considered the extrinsic evidence, that it would have granted Warner Chilcott's motion. The argument here on appeals, the court did not give adequate weight to that evidence, did not consider the evidence as completely set forth, and that more importantly, Warner Chilcott had offered no evidence in opposition, proving either the knowledge of those of skill in the art or that the terms in the whereby clause would not have had a reasonably certain meaning to those of skill in the art. In so doing, he switched the burden over to Bearer, and Warner Chilcott had not met its burden. The district court, as part of the claim construction hearing, was not resolving the indefiniteness of the patent at suit. The court confirmed in the subsequent conference after claim construction argument that generally it's his practice not to treat indefiniteness in claim construction as part of the same proceeding. Okay, and he didn't hear. He asked for a motion for summary judgment. And he did not. He didn't decide the indefiniteness in the context of claim construction, right? That's correct, Your Honor. He did not. And there was, we don't think a dispute, there should be a dispute that that is what occurred. At the time of claim construction, neither Warner Chilcott had sought permission to move for summary judgment, which was the district court's rules. I guess I'm not really clear what point you're making here. Well, the point, Your Honor, there's been an argument that in the claim construction argument, Bearer had waived reliance on extrinsic evidence as part of the indefiniteness inquiry. And that during the claim construction argument, when the district court asked why extrinsic evidence should be considered under vetronics, when Counsel for Bearer said that it was not necessary as part of claim construction, that that subsequently meant that it was not necessary as part of indefiniteness either, that it resolved the issue on indefiniteness as well. So the point here is simply that. All right. So let's assume there's no waiver here. Assuming there's no waiver, then we move on to the indefiniteness question. And the district court posed the question in his claim construction order as having continued questions regarding the plain meaning of the claim language and the terms of degrees set out in the claim language itself. And you posed different theories for how the language and the claim should be construed in your claim construction versus your response to the motion for summary judgment, right? No, Your Honor. No. The theories, what you're referring to, I believe, are two declarations by Dr. Shulman. The first declaration submitted as part of claim construction was regarding the construction that, for example, high contraceptive reliability is assessed compared to a population of healthy women not taking hormonal contraceptive. The district court rejected. That was Bearer's construction. The district court rejected that construction and rejected Warner-Chilcott's alternative construction. The question then turned to indefiniteness where the district court asked in its opinion that it had continued questions regarding the plain meaning of the claim language, in particular, the terms of degree. How high is high? How low is low? What does reliable mean? Dr. Shulman's second declaration assesses those questions. And those are the questions that were the basis for the court's concerns over indefiniteness of the patent. And there, Dr. Shulman said, a person of skill in the art knows reliability is high when the reliability is comparable to other marketed oral contraceptives. And in his original declaration, he had said that even when comparing oral contraceptives, the comparison of oral contraceptives, the question is still, what is the effect of the oral contraceptive on a population of healthy women? Although compare is used in both, the comparison is not different. It's simply answering two different questions at two different phases of the proceeding. I don't even understand how you can say the whereby clause is as compared to a woman not taking contraceptives. A woman not taking contraceptives, high contraceptive reliability. Well, if you're not taking contraceptives, how do you have any contraceptive reliability? It doesn't make sense as a point of comparison. Like the way the language is written, I don't understand your proposed construction. And you're right that women not taking contraceptives, by definition, that there is no contraception occurring. But as explained in Dr. Shulman's declaration, when these are tested, when oral contraceptives are tested, they are tested on a population of healthy women. The assessment is the effect of the drug on a population of healthy women not taking hormonal contraception. And that is how the construction being high contraceptive reliability as compared to a population of healthy women not taking hormonal contraception. It's part of the test of the contraceptive itself to see the effect on the body, the pharmacologic effect. What about low incidence of follicular development? What is the measure of that? What is the standard of that? Low incidence of follicular development. As part of claim construction, Bayer's proposed construction was low incidence of follicular development. Again, based on the normal menstrual cycle. It would be evaluated based on the normal menstrual cycle. Can I ask you a question? Yes. For all of these different terms, wasn't it your claim construction position that it was compared to a woman who was not taking contraceptives? Yes, Your Honor. Okay. Because the assessment of the drug itself is done on a population of healthy women who are not taking contraceptives. Then later, in response to the summary judgment motion, you said it was compared to other contraceptives on the market. Is that correct? The question at summary judgment was how would a person of ordinary skill know that contraceptive reliability was high, for example. Dr. Shulman's declaration is that a person of skill in the art would know that contraceptive reliability was high based on the knowledge of how contraceptives perform, marketed oral contraceptives. The level of performance, the degree of contraceptive reliability is assessed against the knowledge of the market and how these products... What's your position today on how this should be construed? How it should be construed? How the language... Today, we have the plain language. The district court was at an impasse with respect to construction of both... Rejected both parties' constructions, and we have the plain language. We think that language can go forward in the case, and it becomes a question, first, of indefiniteness, which we think should occur on a full record, and then of infringement. You need to answer her question directly, because your circular answer, which doesn't respond to it, only makes the whole indefiniteness finding more appealing. Can you answer her question directly? What is your construction? Don't just say, oh, plain language. That doesn't help, because the district court found the plain language to be indefinite. High contraceptive reliability as compared to what? Low incidence of follicular development as compared to what? Bayer's position appears to me to be a moving target in this litigation. I understand why. District court rejected your first construction. Got to go to your fallback position. I get it. But what is your argument now on appeal regarding how this claim should be construed? If I could answer it in two parts, the first is we would continue with what we've put forward as part of the indefiniteness case, that high is understood based on the performance of oral contraceptives and how those are... the performance of oral contraceptives generally. That is the knowledge of those of skill in the art when assessing high. Does that include products that are currently on the market? Currently, but of course the question is at the time of the patent itself. It was 1995. That's correct. So it was over 10 years ago. That's correct. So the comparison would be products that were on the market in 1995? Yes, because the meaning is as of the time of the patent. That would be the comparison that the person would have to make. Your Honor, if I could, one point with respect to your question, which was the difference between the construction. When Dr. Shulman said in his first declaration, or Bayer's first construction, which was high compared to a population of healthy women, the next question became how does a person of ordinary skill know what high means? That was a term that had not been defined, had not been construed. And so the question necessarily then turned to, as part of indefiniteness, whether a person of skill in the art would understand this term. And Dr. Shulman's statement was that they would because they would be able to compare this, understand the performance of the contraceptive against the performance of other contraceptives, the knowledge of those of skill in the art. Before you run out of time, can I just take you somewhere else, which is back to the prosecution history? Because the other side says, and the prosecution history to a certain extent bears out, that the reason for introducing this whereas clause was in the face of a rejection for obviousness, right? It was, yes. And your argument in putting it in is this shows the superiority of the product we're claiming, of what we're claiming, right? It shows the distinction from the prior art with respect to being able to have a very low estrogen amount yet still achieve this profile. It says contrasted with the superior results of the present regimen. Yes. And the question of superiority was raised directly as part of claim construction and part of claim disavowal. And it was found not to have been disavowed. I didn't ask you about disavowal. I just asked you, is that correct? So the reason for putting this language in in the first instance was in the face of an obviousness rejection. Why? Was it because it was obvious? It's just a little odd to me. This was so you had to put in unexpected results, and that's what got you the claim? Well, the teaching was that as you lower the amount of estrogen, you begin to sacrifice, for example, cycle control. The point, I believe, in the prosecution history that was being made was that even though you continue to lower estrogen, with this regimen you are able to achieve these effects in a way that if you were to lower estrogen in other contexts, you would not. So, yes, in that sense it is the differential effect. But just the lowering of estrogen was found to be obvious by the examiner. And that's why you had to put in this whereas clause which described unexpected results in the face of lowering the estrogen? Is that what you're saying? Yes. There was an obviousness finding with respect to the regimen itself excluding the whereby clause. So you're saying your use of the word superior wasn't in connection with products currently on the market. It was for products that might use lower estrogen levels? Yes, Your Honor. That's not a good question. I'm really just trying to understand what you're saying. No, there were two prior art regimens cited for the basis of obviousness, and it was with respect to those two regimens. Okay. All right. We're into rebuttal. Why don't we save your rebuttal and we'll hear from the other side. Good morning, Your Honor. Christopher Sykes here on behalf of the respondent, Warner Chilcott. I think the key point to begin with, although there are several defects, I believe, with Petitioner's argument, is that what we're talking about here is claim construction. And in particular, a claim construction that Baird did not present during the Markman proceeding to the district court. And the district court specifically found that and found waiver on that basis. They did not argue comparable to other marketed plural contraceptives during Markman. When somebody makes a claim construction argument and it's rejected by the district court, aren't they allowed to go ahead and make a different argument? Your Honor, that's up to the district court and its ability to manage the docket and the case. This court has held, for example, in central admixture that where a proposed claim construction is not presented, they cannot then pursue it later. And that makes sense. This is a matter of what do the claims mean before it moves on to the next proceeding. And that is, of course, the first step even in indefiniteness, is what do the claims mean? What is the scope and understanding of the claims? And the court needs a procedure to resolve that before moving on. And the well-established procedure for that is Markman. And they came in with one meeting at Markman. And to be clear, it's not that they then refined it. In Markman, they said specifically that it was a comparison to women not on contraceptives, not other women, not comparison to other oral contraceptives. At JA505, for example, in their opening Markman paper, they said, assessing satisfactory cycle control requires comparing the cycle control of an oral contraceptive to the menstrual cycle of healthy women who are not. And what did you argue the claim should be construed as? We argued that it was indefinite. But the degree that it had any meaning, and we believed comparisons could not be done, it was superiority based on the intrinsic evidence. And as I can go through, even their current kind of instruction, they argue on appeal and they argue in a summary judgment is inconsistent with the intrinsic evidence. But the court first fact before moving on to that. Then why aren't you right that it's superiority? We are correct that it is not comparability. But the problem with superiority is one cannot compare superiority to other. One could say, for example, a man who is of height comparable to other men or a man who is taller than other men. But that all remains subjective. How much taller compared to what men? And the intrinsic evidence makes even... No, well, superiority, I mean, there were a number of prior art references before the examiner, at least two different oral contraceptives when he issued his obviousness rejection. They added this clause and they said this would demonstrate this product's superiority. Why isn't it sufficient to infer from that, as you all suggested at claim construction, that it is this product's superiority as compared to the prior art at the time of the patenting? To be clear, even at summary judgment, they did not suggest that there were specific products called out that could be compared. They said generally the marketed products. The district court at January 9... Okay, fine, maybe it would be all the products, all the prior art that existed. And the problem, of course, is that prior art products vary as the intrinsic evidence itself teaches. For example, it references Myrcelin as one prior art product that has less good cycle control than other products. But it doesn't say whether that cycle control is satisfactory or not. So we have intrinsic evidence that's teaching that all of these vary even as to marketed products, but doesn't tell you how to do the comparison, either for comparability or superiority. But what if one of skill in the art would understand what satisfactory cycle control is? The problem with that, Your Honor, is that it is subjective. We're back into data mice. Each individual person might have their own yardstick. No, not each individual person. What if one of skill in the art understood what the industry meant when it said satisfactory cycle control in the context of birth control? I'm Catholic, so I'm not so good on all this. However, I think even I can venture a guess as to what is meant by satisfactory cycle control and probably be right simply as a woman. Well, Your Honor, cycle control is different, for example, than contraceptive reliability. And so, for example, there may be different degrees of amenorrhea. How much amenorrhea, which is avoidance of bleeding in between, is satisfactory? There is spotting or intracyclic bleeding as part of cycle control. How much is satisfactory? How much is better than the other products? Well, the other products vary. Take the reliability clauses, reliable avoidance of undesirable side effects. Well, how do you compare superiority with regard to headaches versus cardiovascular versus breast tenderness? They all vary. At what point is it comparable if one is better at avoiding headaches but produces more breast tenderness or greater cardiovascular results? Which is superior? Which is comparable? It is impossible to answer that question. Each one of these terms, every one of the five terms, has degree. Low incidence of follicular development. Well, follicles grow and then one gets recruited. Maybe it grows to 10 milliliters. Maybe it grows to 13. If you have one regime in which a certain percentage of women, they get to 10, if you have another regime where it's fewer women but it gets to 13 milliliters, which is superior? You can't know. The district court knew all things. And the key point here is twofold. Each one of these is manifold issues of degree. There's no dispute. These are issues of degree, and they are ones that are subjective. But we've never suggested that subjective words or issues of degree necessarily render a claim indefinite. It all depends on what one of skill in the art would understand about the subject matter. So why isn't that a fact question that ought to go to a fact finder? Your Honor, it's a legal question, and the court has said that without objective boundaries, the claims are indefinite. It said in datumized, some objective standard must be provided in order to allow the public to determine the scope of the claim of invention. And in interval licensing, it is not enough, as some language in our prior cases may have suggested, to invite some standard for measuring the scope of the phrase. The claims, when read in light of the specification of prosecution in history, must provide objective boundaries. Yes, and that all turns on whether one of skill in the art would understand them to provide objective boundaries. So high contraceptive reliability. Why wouldn't one of skill in the art understand what that means? You don't end up pregnant. It seems like a pretty straightforward concept to me. Your Honor. So I don't know what I'm missing, and I'm not certainly not one of skill in the art. However, I mean, if one of skill in the art could provide that information, why isn't that relevant to deciding whether the words high contraceptive reliability, even though you're correct, they have a degree of subjectivity to them, would nonetheless provide objective boundaries in terms of how one of ordinary skill in the art would understand them? Your Honor, these are not light switches. In other words, high contraceptive reliability can't be 100%. Or if it is 100%, then there's nothing but that. But the problem with contraceptive reliability is that it varies. What percentage of women, what is the risk of pregnancy taking this? Cycle control, follicular development, avoidance of intracyclic menstrual bleeding, reliable avoidance of undesirable side effects. Each one of these are degrees. It's not a matter of light switch on or off. Every one of them is degrees, and there is no objective standard for any one of them. The blanket here is coming with two different inconsistent standards in an effort of claim construction, a legal question. First, comparing it to healthy women, then comparing it to other marketed contraceptives. The intrinsic evidence not only refutes what they've come in with, but shows the variance. Shows, for example, in talking about Myrcelin, that the cycle control, the follicular development varied, but doesn't even say whether that marketed product, Myrcelin, meets the requirements of the whereby clause. Taking now their claim construction of comparable to other combined oral contraceptives on the market, what if we had clear evidence, and there was no dispute, that if you took all the products on the market in 1995, this is where they would be on all these indicia, on what is high, what is low, et cetera. And what if we could easily determine what those comparable products consisted of with respect to each of these categories? Would that be sufficient? It might well be if you had a single one, take contraceptive reliability, and there was a benchmark, 90%. That would be the sort of objective boundary, or 99% reliability. That might be. The problem here is some of them are not amenable to benchmarks at all. Reliable avoidance of undesirable side effects. Why? Because you have a variety of undesirable side effects, which are independent. Headaches versus breast tenderness, versus cardiovascular events, for example. So they may vary, both in their incidence and their severity for each one. It's impossible to think about how one would have a benchmark, but there has been no suggestion for any of these that there is such a benchmark. And as I say, the intrinsic evidence specifically says that it varies, and the district court observed that in rejecting even comparability as a definite term. There is no, in fact, benchmark products, benchmark levels to compare to. And for some, follicular development is another one. There is no such benchmark, because it varies in terms of the women who experience levels of follicular development, how far developed it goes. And again, the intrinsic evidence says specifically about Mersolon that there was greater follicular development without saying whether or not that was a low incidence of follicular development or not. So not only do we know that there's no benchmark, that is that products vary, and they vary by degree and amount, but the patent provides absolutely no guidance, and the extrinsic evidence provides absolutely no guidance on to what any benchmark is for any one of them, let alone all five of them. And we're beginning here, comparability with a construction. That's clearly claim construction. What do these terms mean? The patent holder did not present during the claim construction phase of the case. So the court began with the point, we've had our opportunity for claim construction. You've not presented this as claim construction. You've waived this. And then said, even if I took it up, one, it's the wrong claim construction, which seems right, and two, it doesn't provide me a benchmark. And just as comparability doesn't provide a benchmark, neither would superiority, because you can't judge superiority any more than comparability without a benchmark and a way of measuring it. And the district court found all of those problems step by step and correctly did so. These are terms that are subjective terms without fixed meaning. They've been unable to construe the claims, which means, without construction, that there is no objective boundaries, that they are, in their nature, subjective, without objective boundaries. And the court has held repeatedly, in datumized, in interval, in tau ativa, that subjective terms are, without objective boundaries, are legally indefinite. And that it's not a matter of sending it to a jury with subjective terms to figure out whether the jury can sort through that. That this question of indefinite is a legal question. And where claim terms are not subject to construction to have objective boundaries, they are, by law, indefinite. Your Honor, if there are no further questions. Thank you. Thank you, Your Honor. Very briefly, thank you to the court. One, I want to return to a question from Chief Judge Prost I don't think I answered particularly helpfully. The prosecution history is at 1317 and says, the deficiencies of the prior art multi-phasic combination preparations, including two of the prior art regimens used on the obviousness rejection, are discussed in the specification and contrasted with the regimen itself. That was the statement made as part of the prosecution history. I want to make sure that I answered your question and was clear on that. And finally, just very briefly, unless the court has any other questions, the statements regarding what a person of skill in the art would or would not understand were not before the district court as part of the summary judgment on Warner Chilcott's side. The only evidence at that time put forward was that by Bayer's expert as well as the extrinsic evidence that showed, as Judge Moore pointed out, that these terms are used in the art. They are understood by those in the art as clinical assessments regarding what are essentially very important design elements of an oral contraceptive itself. So to the extent that there is a question, a factual question, over the scope of knowledge of one of skill in the art, the record as it currently stands on summary judgment is Bayer's evidence and the claim construction order on the other side. We think that that is sufficient to create at least an issue of material fact and justify reversal here. And unless the court has any other questions, I would surrender my time. Thank you. I thank both counsel and the case is submitted.